OWEN BRADLEY, Administrator of Estate of MARY BRADLEY, Appellant, v. CHARLES J. BECKER.—11 S. W. (2d) 8.

Court en Banc, November 24, 1928.

*C. J. Anderson* and *Earl M. Pirkey* for appellant.

408

*Kelley, Starke & Hassett* for respondent.

ELLISON, C.—This is the second appeal in this case. The former is reported in 296 Mo. 548, 246 S. W. 561. The action is for $15,000 damages sustained by appellant's intestate, Mary Bradley, in an automobile collision at the intersection of Gravois Avenue and Chippewa Street in St. Louis. With members of her family she was riding to the funeral of a relative in an automobile provided and operated by the Mayer Undertaking Company and the Reliable Auto Livery Company—referred to in the record as the "limousine defendants" and hereinafter so designated. The automobile collided with a Ford motor truck owned and operated by the defendant-respondent Charles J. Becker, the intestate's injuries resulting.

She brought this suit against the three defendants named and on the second trial had a verdict against the limousine defendants for

$2500, but the jury found for the respondent. Both she and the limousine defendants appealed. Thereafter Mary Bradley died and her appeal was revived in this court in the name of her administrator under Section 4231, Revised Statutes 1919. The limousine defendants failed to prosecute their appeal and have dropped out of the case. Appellant makes twenty-eight assignments of error in his brief. All complain of the giving or refusal of instructions, and the admission or exclusion of evidence. It will not be necessary to cover the whole field of controversy to dispose of the case.

Gravois Avenue runs from southwest to northeast—more east than north—and Chippewa Street almost due east and west. The former is a wide thoroughfare with double street-car tracks in the middle, and a considerable volume of rapid motor traffic, whereas the latter is a little-used, macadamized by-street. In the intersection area of the two streets the brick paving on Gravois Avenue is extended out to the property lines. At the southeast corner of the intersection is a brick building formerly used as a saloon, which stands out flush with the east line of Gravois Avenue but some twelve feet back from the south line of Chippewa Street. At the time of the accident a beer truck was standing alongside the east curb of Gravois Avenue in front of this building. The front of the beer truck projected north of the brick building three or four feet to within eight or nine feet of the south line of Chippewa Street, and to one coming from the south on Gravois Avenue tended to obstruct the first view northeasterly of Chippewa Street.

Early in the afternoon of a bright, clear day in November, 1918, the limousine in which the intestate rode was going north, or northeasterly, on Gravois Avenue, traveling within four to eight feet of the east curb. As it approached Chippewa Street and got within twenty-five to fifty feet of the intersection it was running at a speed of twelve to fifteen miles per hour, the driver, Bernard Hoppe, testified. At that point he turned a little to the left to pass the beer truck, sounded his horn and slowed down to eight or ten miles per hour, moving during the operation something near twenty feet. When he got even with the front of the beer truck he saw for the first time the Ford truck driven by respondent's employee, Max Schoenemann, approaching the intersection from the east, on Chippewa Street. It was traveling in the middle of Chippewa Street at a speed of twenty or twenty-five miles per hour, and was about fifteen feet back east of the edge of the paving—the east property line of Gravois Avenue. During the instant of time it took Hoppe to realize how fast the truck was going it had traveled probably twenty feet. He undertook to stop "right then." He says:

"I then swerved to my left and brought my car practically to a stop about the middle of the two—I put my foot on the brakes and

threw my clutch out. Swerving toward the left would take me toward the center of Gravois. When the limousine stopped it was about in the center of the two streets. From the time I first saw the truck until the time of the collision, it never did anything, just kept on coming, never swerved to the right or the left, just kept going right on through, kept going right straight out into Gravois. The point of collision was right in the center of the two streets. The limousine was struck on the right front, on the side, between the door and the front wheel on the right side.''

The front wheels and fenders of the Ford truck struck the limousine, and as a result of the collision the former was turned clear around and headed back toward the east, coming to a stop in Chippewa Street clear past the east line of Gravois Avenue.

Hoppe further said that from the time he first saw the respondent's Ford truck it continued in plain view all the time until the two cars collided, that his eyesight and faculties were good, and that both the service and emergency brakes on the limousine were in perfect working order. On cross-examination by respondent's counsel he stated that from the place by the standing beer truck where he had slowed down to eight or ten miles per hour and first saw the Ford truck, he ran about thirty-nine feet to the point of collision and that the limousine had then practically come to a stop. It moved about two feet after the collision. He further said the minimum distance in which the limousine could have been safely brought to a stop from a speed of eight or nine miles an hour was fifteen or twenty feet, and from a speed of ten miles per hour about twenty-two feet. Being asked why he ran thirty-nine feet if he could have stopped in twenty-two feet, he answered he was afraid to keep going straight ahead because he would have been struck by the Ford truck. He was then asked: ''Now, isn't the reason that you didn't stop quicker was because you didn't want to burn the rubber up on the tires, isn't that the real reason that you didn't stop quicker?'' and he answered ''Yes, sir.'' He then admitted that in the former trial he might have said, ''I didn't want to burn the rubber up, you know,'' and that there was no reason why he could not have stopped in twenty-two feet.

The intestate, Mary Bradley, testified she didn't see the Ford truck at all. Her daughter, Mrs. Sexton, saw the truck only an instant before the collision. John J. Bradley, a son of the intestate, substantially corroborated the evidence given by the limousine chauffeur, Hoppe, on the latter's direct examination, except that Bradley said the limousine travelled northward along Gravois Avenue at a speed of about twenty-five miles per hour (instead of twelve to fifteen miles as Hoppe testified) until it reached a point about five feet

north of the saloon building. He first saw the respondent's Ford truck as the middle of the limousine was even with the front of the beer truck standing in front of the building. The Ford truck was just coming on to the pavement at the east side of Gravois Avenue. This witness estimated the distance from him to the Ford truck when he first saw it at about ninety feet and said it ran about that same distance thereafter to the point of collision in the center of the intersection. But this seems very inaccurate in view of the testimony of respondent's witness Schmitz, a civil engineer, that the distance from the point where the Ford truck crossed the east line of Gravois Avenue to the center of the intersection is only sixty-eight or sixty-nine feet; and to the point marked on the plat in the record as showing where the automobiles collided, the distance scales only thirty-five feet. It is possible the witness meant the total distance traveled by the Ford truck from the time he first saw it until it came to a stop after the collision was ninety feet.

The driver of the respondent's truck, Max Schoenemann, testified that as he drove west in Chippewa Street on to the pavement of Gravois Avenue, he was going only about six miles an hour. He looked both ways and saw nothing coming. Then his testimony continues:

"There was a beer truck standing at the corner and I could see from a‧ angle and I—as I kept on going I was on the pavement and I looked again and I saw a big limousine coming along at a pretty rapid speed; he didn't look like he was going to stop or slow down, so I put on my brakes. As I put on my brakes, the street being wet my brakes locked and I skidded a few feet, and he just came along and hit me on the front wheel and the fenders, put a dent in the left side of my radiator, and turned me completely around facing east." (In an additional abstract filed by the respondent it is shown this witness testified the limousine was going twenty miles per hour at the time of the collision.)

At the time of the collision there was in force in St. Louis an ordinance known as Ordinance No. 3013, Section 1277 of which provided that drivers of motor vehicles when approaching a crossing should sound their signals in such way as to give warning to other vehicles of their approach. This ordinance was pleaded by the plaintiff and introduced in evidence. Three witnesses had testified the Ford truck sounded no signal of any kind. During the cross-examination of this witness, Shoenemann, he was asked whether he sounded his horn at the intersection. He replied: "Well, my horn was not working so I raced my motor. My horn was not working at all. I just made a noise and raced my motor to make a noise." At this point Mr. Kelley, counsel for respondent, interrupted: "You

didn't need to sound your horn under the law, saw him back fifteen feet from the pavement,'' by which he meant, as he later explained, that the limousine defendants' witness Hoppe had previously testified he saw the truck when it was fifteen feet east of the east line of Gravois Avenue and thereby became advised of the approach thereof in time to stop his own limousine notwithstanding the failure of the truck driver to blow the horn. In other words, according to respondent's contention there was no causal connection between the failure to sound the horn and the collision. A long dialogue between counsel followed, covering three pages of the printed record, during which counsel for appellants called to the attention of the court and opposing counsel the fact that that identical point had been determined adversely to their contention when the case was in the Supreme Court before, but the trial court nevertheless ruled the question out and struck the answer from the record.

Following that up, at the close of the evidence appellant's intestate requested the court to give an instruction, marked E, telling the jury if the respondent failed to sound a signal or to give any other warning of the approach of the truck before the collision, and if such failure was a direct cause thereof and of her injuries, their verdict should be for her. The court refused the instruction and instead gave one marked No. 10, requested by respondent, declaring there was no evidence to sustain the charge in the petition that the respondent negligently failed to sound the horn on his truck or to give any warning of its approach, and withdrawing that issue from the jury.

I. The ruling of the court on these Instructions E and 10 was wrong for two reasons. In the first place there *was* evidence, as heretofore stated, that the respondent's truck driver failed to sound his horn at the crossing. Some of the testimony was admitted in the earlier stages of the trial without objection and before any question had been raised against that class of testimony. In the second place, the precise point was decided when the case was here before (296 Mo. 1. c. 557, 246 S. W. 1. c. 564) and it was held that notwithstanding Hoppe's admissions there was substantial evidence tending to show a causal connection between the failure to sound the truck horn and the ensuing collision—that is to say, evidence indicating the limousine chauffeur could not stop after he saw the car, whereas the collision might have been avoided if the horn had been sounded. It is not contended by respondent that the evidence on the second trial was more favorable to him, or that the issues were different. On the contrary this court is asked only to ''reconsider'' the former ruling, which was in Court en Banc.

No reason is apparent to us why the rule *stare decisis* should not be applied (Davidson v. St. L. & S. F. Ry. Co., 301 Mo. 79, 85, 256 S. W. 169; Mangold v. Bacon, 237 Mo. 496, 511, 141 S. W. 650), or why it should not have been equally binding on the trial court.

We are, furthermore, of the opinion that the ruling made on the former appeal works no injustice under the facts in the record this time. Respondent's theory will not stand up unless it can be said as a matter of law that the limousine chauffeur actually knew the Ford truck was approaching in time to have stopped his own car safely and in the exercise of due care. In endeavoring to maintain that proposition respondent casts himself on the testimony of the chauffeur, Hoppe, that the limousine was thirty-nine feet from the point of collision when he first saw the truck, at which time he was moving eight to ten miles per hour, and that the minimum distance in which he could have stopped, going at that speed, was fifteen to twenty-two feet. But several things are to be remembered: first, that Hoppe was not appellants' witness, but an adversary witness for the limousine defendants; second, that parts of Hoppe's testimony indicate he did stop as quickly as appeared safe and possible in an emergency; and, third, that it is by no means conceded he was only going eight or ten miles an hour when he first saw the truck. The appellants' witness John J. Bradley said the limousine was going twenty-five miles per hour and the respondent's own witness Shoenemann said it was still going twenty miles per hour at the time of the collision, and that it looked as if it were not going to stop from the time he first saw it. We are not inclined to recede from the conclusion on this point reached in the former report of the case.

II. The appellant complains of the giving of seven other instructions for respondent and makes a number of assignments addressed to the exclusion of testimony by the court. Some of these criticisms are well founded, we think, but nearly all the errors were of a procedural nature and will disappear on a retrial. There are, however, two instructions which call for a word of comment. By respondent's Instruction 15 the court told the jury if the limousine defendants, being carriers for hire, by the exercise of the highest degree of care and watchfulness in the management and control of the limousine could have prevented the collision but negligently failed to do so, then they were liable for all injuries resulting to the plaintiff from such negligence. Instruction 16 is substantially the same in theory. As between the plaintiff and the limousine defendants the two instructions were correct statements of the abstract law, for a plaintiff may elect to sue any one or more of several concurrent or joint tort-feasors; but it does not lie in the mouth of either of the latter

to say the *onus* of liability shall be cast on his fellow-culprit alone. [Carr v. St. Louis Auto Supply Co., 293 Mo. 562, 569, 239 S. W. 827; 29 Cyc. 496.] As written, and coming from (or in behalf of) one of three defendants jointly sued, the instructions in effect were declarations that if the limousine defendants could have prevented the collision, they were solely liable notwithstanding respondent's negligence—at least they admit of that construction. This of course is not the law since, as we have twice held, there was substantial evidence tending to show respondent's negligence in failing to sound the horn was one of the proximate causes of the collision. The last chance doctrine, or its counterpart, cannot be invoked as between joint or concurrent tort-feasors. Such an application would subvert its ob· ject and purpose.

For the errors noted the cause is reversed and remanded.

PER CURIAM:—This cause coming into Court en Banc from Division One, the foregoing divisional opinion of ELLISON, C., is adopted as the decision of the court. All of the judges concur.